UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MICHELLE J.,[1]

                                        Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

DECISION and
ORDER

1:21-CV-00306 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final
determination of the Commissioner of Social Security ("Commissioner" or
"Defendant") which denied the application of Plaintiff for Supplemental Security
Income ("SSI") benefits.   Now before the Court is Plaintiff's motion (ECF No. 8)
for judgment on the pleadings and Defendant's cross-motion (ECF No. 9) for the
same relief.   For the reasons discussed below, Plaintiff's application is denied,
and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-
step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims.
> *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that,
"[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-
government party will be identified and referenced solely by first name and last initial."

considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[3]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action,

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[3] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

"[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at \*4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even where the administrative record may also adequately support contrary findings on

4

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff has numerous medical conditions, but her claim in this action relates to just one of those conditions, a gastro-intestinal stromal tumor ("GIST"). Plaintiff had successful surgery to remove the tumor and was then placed on the chemotherapy medications Gleevec and Imatinib, which can cause side-effects including skin rash, diarrhea, nausea and vomiting.

In his decision denying Plaintiff's application for SSI benefits, the ALJ essentially found, as part of a lengthy discussion of all of Plaintiff's conditions, that Plaintiff was tolerating the chemotherapy medications well.

More specifically, in finding that Plaintiff still had the RFC to perform less than a full range of light work, the ALJ first noted that Plaintiff "testified she is regularly sick due to her chemotherapy regimen," and that "she has side effects of diarrhea, vomiting, and shaking hands." (Tr. 22).   The ALJ indicated, however, that Plaintiff's subjective complaints in that regard were not fully consistent with her medical treatment records.   The ALJ observed, for example, that medical records indicated that Plaintiff had "responded well afterwards" to the tumor-

5

removal surgery. (Tr. 22).   Further, the ALJ reported that Plaintiff had, since the SSI filing date, "generally responded well to conservative treatment modalities, including medication management (with Gleevec/Imatinib and Immodium for GIST." (Tr. 22).    The ALJ also stated:

> A May 2020 oncology treatment note indicated that the claimant was doing well with only occasional stomach cramping and that various performance scales showed that the claimant is 'restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light housework, office work . . .  able to carry on normal activity . . . minor signs or symptoms of disease' (Exhibit C28F, page 4).   Another May 2020 primary care telemedicine treatment note indicated that the claimant had no new complaints, was tolerating various conservative treatments well, and remained physically active (Exhibit C27F, page 7).[4]

(Tr. 23).

    In this action, as discussed further below, Plaintiff maintains that the ALJ erred by impermissibly "cherry picking" evidence that downplayed the severity of her chemotherapy side effects, while ignoring contrary evidence.

    Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

    The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

    Plaintiff maintains that the ALJ erred by impermissibly "cherry picking" evidence that supported his determination that Plaintiff was not disabled.

---

[4] Notes from this appointment on May 4, 2020, indicate that Plaintiff was tolerating her chemotherapy "reasonably well," and that, "She reports only intermittent, mild nausea and her diarrhea is controlled on diphenoxylate prescribed by her oncologist." Tr. 1484.

Of course, an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).[5]   Certainly, however, remand may be appropriate where a plaintiff

---

[5] *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days .... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing Dr. Dron's opinion.").

demonstrates that an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

In this action, Plaintiff makes the following argument in support of her claim that the ALJ cherry picked evidence:

> Here, the ALJ cherry picked evidence related to the side effects of Plaintiff's chemotherapy. The ALJ dedicated one brief paragraph to the topic of the Plaintiff's chemotherapy and its side effects, and the only analysis on the topic was to raise two seemingly positive medical notes. The ALJ cited a May 2020 oncology note ("Report One") that Plaintiff had some physical limitations but could do some activities or light work, and another May 2020 note ("Report Two") that Plaintiff was tolerating treatment well and remained physically active. T.23. That was the full extent of examining the medical evidence of Plaintiff's chemotherapy and all of the side effects.

> One need not look far to identify instances of cherry picking. For instance, the ALJ characterized report two as containing information that Plaintiff was "tolerating various conservative treatments well, and remain[ing] physically active." T.23. In that same report, Plaintiff's primary care provider also wrote that Plaintiff was "feeling tired, [with] intermittent nausea, vomiting, diarrhea, [and] poor/reduced appetite." T.1479. Similarly, in Report One, the ALJ only quoted the line that Plaintiff was capable of some activities but declined to mention similar notes to Report Two: that Plaintiff had "abdominal pain, diarrhea and nausea." T.1495. Additionally, due to Plaintiff's chemotherapy medication, she experiences fatigue. *See, e.g.*, T.336; T.519; T.678; T.1155; T.1162.

> At the hearing, Plaintiff testified that the primary barrier to her employment was the chemotherapy medication and its side effects.

> *See, e.g.*, T.45 ("The chemo just have me feeling like my body is just
> drained. I can't do anything anymore, nothing."); *id.* (in answering
> what exacerbates Plaintiff's pain, "it's all the chemo"); T.60 (Plaintiff
> describing her daily vomiting and diarrhea due to the chemotherapy
> medication); T.63 ("The things that have been keeping me from
> working, once again, … is the chemo."). These type of side effects
> are well-known and Plaintiff was even told to expect them. *See*
> T.1154 ("I have advised the patient that imatinib can cause skin rash,
> diarrhea, nausea, [and] vomiting."). On the very next page, notes
> show that in October of 2019 Plaintiff presented to the emergency
> department "experiencing nose bleeds along with blood while
> vomiting" along with fatigue and skin rash. T.1155. By January of
> 2020, Plaintiff was still experiencing "diarrhea, nausea and vomiting."
> T.1167. In fact, the diarrhea nausea and vomiting had become so
> severe, that Plaintiff had ceased taking her chemotherapy
> medications. T.1168.
>
> Therefore, so that the ALJ may examine the full record and explain
> how Plaintiff is capable of performing at her RFC-level despite the
> side effects of her chemotherapy, Plaintiff requests remand. *Cf.
> Strange v. Comm'r of Soc. Sec.*, 2014 WL 4637093, *9 (N.D.N.Y.
> Sept. 16, 2014) ("'Cherry picked' decisions do not satisfy substantial
> evidence standards because reviewing courts cannot conclude …
> that adverse findings were based on evidence reasonable minds
> might accept as adequate to support a conclusion.").

Pl.'s Mem. of Law, ECF No. 8-1 at pp. 6–7.

As a preliminary matter, concerning Plaintiff's complaint about the brevity of
the discussion in the ALJ's decision of chemotherapy side-effects, it is clear that
"[a]n ALJ does not have to state on the record every reason justifying a decision
and is not required to discuss every single piece of evidence submitted." *Ryan on
Behalf of V.D.C. v. Comm'r of Soc. Sec.,* No. 21-2947-CV, 2022 WL 17933217, at
*2 (2d Cir. Dec. 27, 2022) (citation and internal quotation marks omitted).

Consequently, even if the ALJ devoted only "one brief paragraph" to chemotherapy side effects, such fact, in and of itself, would not warrant remand.   In fact, though, the ALJ mentioned such side-effects at more points in the written decision than Plaintiff acknowledges. (Tr. 22, 23, 26).

Moreover, to the extent Plaintiff may be suggesting otherwise, the ALJ did not ignore or mischaracterize her subjective complaints related to the medications, but acknowledged that, "She testified that she is regularly sick due to her chemotherapy," and, again, that, "The claimant also noted that . . . she has side effects of diarrhea, vomiting, and shaking hands." (Tr. 22).

Turning to Plaintiff's primary argument, she contends that the ALJ mischaracterized the record as indicating that Plaintiff "tolerat[ed] treatment well and remained physically active."   In that regard, the ALJ actually wrote, in pertinent part, as follows:

> The medical evidence also shows that, since the current SSI application filing date of November 13, 2018, the claimant's chronic pain and symptoms have generally responded well to conservative treatment modalities, including medication management (with Gleevec/Imatinib and Imodium for GIST[)] . . . and specialist treatment with oncologists and neurologists.
>
> A May 2020 oncology treatment note indicated that the claimant was doing well with only occasional stomach cramping and that various performance scales showed that the claimant is 'restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work . . . able to carry on normal activity . . . minor signs or symptoms of disease' (Exhibit C28F, page 4).   Another May 2020 primary care telemedicine treatment note indicated that the claimant had no new

10

complaints, was tolerating various conservative treatments well, and
remained physically active.

(Tr. 23).   Plaintiff maintains, however, that the ALJ's description selectively omits
evidence that she was *not* tolerating her chemotherapy medications well.

As evidence of such mischaracterization, Plaintiff first asserts that the ALJ
misstated the contents of an office note from Plaintiff's primary care physician, Dali
Edwards, D.O. ("Edwards"), dated February 24, 2020. (Tr. 1479-1483).   The ALJ
stated that the note showed Plaintiff was "tolerating various conservative
treatments well," but Plaintiff indicates that the ALJ failed to also state that the
same note referred to her "feeling tired, with intermittent nausea, vomiting,
diarrhea, and poor/reduced appetite."   Overall, Dr. Edward's note indicates that
the chemotherapy drug Gleevec caused Plaintiff to experience fatigue, intermittent
diarrhea, intermittent mild abdominal cramps, and intermittent nausea, but that
Plaintiff was taking Ondansetron and Imodium to manage those side effects. (Tr.
1479) ("Takes ondansetron and Imodium for symptomatic management); *Id*. at
1481 ("Continues on ondansetron and Imodium for symptomatic control.").   From
this, the Court cannot say that the ALJ mischaracterized the contents of the
treatment note.

Plaintiff next asserts that the ALJ misstated the contents of an office note
from Plaintiff's oncologist, Herbert Duvivier, M.D. ("Duvivier") dated May 13, 2020.
(Tr. 1494-1497).   The ALJ stated that the note reported that Plaintiff "was doing
well with only occasional stomach cramping," but Plaintiff asserts that the ALJ

11

erroneously "declined" to also state that the same note referred to her having "abdominal pain, diarrhea and nausea."   Duvivier's note indicates that Plaintiff did, in fact, report "abdominal pain, diarrhea and nausea," but also that she denied vomiting. (Tr. 1495).   Duvivier further noted, however, that Plaintiff was taking Lomotil as needed for diarrhea and Zofran as needed for nausea/vomiting, and that she was generally "doing well":

> GI stromal tumor:   The patient appears to be doing well.   Her appetite is good.   She is trying to lose weight.   She has occasional stomach cramping of unclear etiology.   The patient will undergo reimaging with CT scan of the chest, abdomen and pelvis for restaging purposes.   The patient is tolerating her medication with a significant decrease in diarrhea but still with occasional nausea and emesis.

(Tr. 1496).   From this, the Court again cannot say that the ALJ misstated the evidence.   Rather, it appears the ALJ's summary was essentially consistent with Duvivier's report.[6]

Plaintiff nevertheless maintains that the ALJ overlooked other evidence concerning the chemotherapy side effects.   Specifically, Plaintiff states that in October 2019, shortly after she began taking chemotherapy, she went to the emergency room ("ER") "experiencing nose bleeds along with blood while vomiting along with fatigue and skin rash."[7] Actually, though, the document that Plaintiff

---

[6] Plaintiff further contends that the ALJ overlooked evidence that she experienced fatigue from her chemotherapy medications. ECF No. 8-1 at p. 7.   However, while the record does contain complaints by Plaintiff of "some fatigue," Tr. 1155, Dr. Duvivier did not report Plaintiff having fatigue, but, rather, indicated that Plaintiff "denied" having any "change in energy level." (Tr. 1495).
[7] ECF No. 8-1 at p. 7.

cites in that regard, Tr. 1155, is an office note by Trina Pool, MA ("Pool") dated December 16, 2019, which reports that Plaintiff "went to the ER on 12/8/19 for a rash and was given Benadryl." (Tr. 1155).   The same note reports that Plaintiff was also complaining of "nose bleeds along with blood while vomiting," but not that she went to the ER for those complaints. (Tr. 1155–1156).

More importantly, a report written that same day (December 16, 2019) by Haider Khadim, M.D. ("Khadim") reported that although Plaintiff was complaining of nausea and vomiting, she was nevertheless tolerating the chemotherapy well:

> The patient is currently on adjuvant imatinib and tolerating it well other than some rash which was treated with Benadryl.   The patient will continue to take the same dose of imatinib and will see Dr. Duvivier in 1 month for follow up to check the blood counts.

(Tr. 1160–1161). [8]   A month later, Dr. Duvivier reported that Plaintiff had unilaterally stopped taking Imatinib due to diarrhea and nausea with vomiting, but that he was prescribing Zofran and Lomitil "to help with the side effects." (Tr. 1168). Duvivier also stated that Plaintiff was "fully active, able to carry on all pre-disease performance without restriction," and "able to carry on normal activity" with only "minor signs or symptoms of disease." (Tr. 1168).   Once again, Plaintiff has not shown that it was a misrepresentation of the record for the ALJ to indicate that Plaintiff was generally doing well taking her chemotherapy.

---

[8] A month later, Dr. Duvivier reported that Plaintiff had unilaterally stopped taking imatinib due to diarrhea and nausea with vomiting, but that he was prescribing Zofran and Lomitil "to help with the side effects." (Tr. 1168).   Duvivier also stated that Plaintiff was "fully active, able to carry on all pre-disease performance without restriction," and "able to carry on normal activity" with only "minor signs or symptoms of disease." (Tr. 1168)

In sum, Plaintiff has not shown that the Commissioner's decision denying her application for SSI benefits was affected by reversible legal error or unsupported by substantial evidence.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 8) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 9) for the same relief is granted.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
        March 24, 2023

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

14